# Government Operations in the Event of a Lapse in Appropriations

A government agency may employ personal services in advance of appropriations only when there is a reasonable and articulable connection between the function to be performed and the safety of human life or the protection of property, and when there is some reasonable likelihood that either or both would be compromised in some significant degree by the delay in the performance of the function in question.

August 16, 1995

MEMORANDUM OPINION FOR THE DIRECTOR
OFFICE OF MANAGEMENT AND BUDGET

This memorandum responds to your request to the Attorney General for advice regarding the permissible scope of government operations during a lapse in appropriations.[1]

The Constitution provides that "no Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. The Treasury is further protected through the Antideficiency Act, which among other things prohibits all officers and employees of the federal government from entering into obligations in advance of appropriations and prohibits employing federal personnel except in emergencies, unless otherwise authorized by law. *See* 31 U.S.C. §§ 1341 *et seq.*[2]

In the early 1980s, Attorney General Civiletti issued two opinions with respect to the implications of the Antideficiency Act. *See Applicability of the Antideficiency Act Upon a Lapse in an Agency's Appropriations*, 4A Op. O.L.C. 16 (1980) ("1980 Opinion"); *Authority for the Continuance of Government Functions During a Temporary Lapse in Appropriations*, 5 Op. O.L.C. 1 (1981) ("1981 Opinion"). The 1981 Opinion has frequently been cited in the ensuing years. Since that opinion was written, the Antideficiency Act has been amended in one respect, and we analyze the effect of that amendment below. The amendment amplified on the emergencies exception for employing federal personnel by providing that "[a]s used in this section, the term 'emergencies involving the safety of human life or

---

[1] We do not in this memorandum address the different set of issues that arise when the limit on the public debt has been reached and Congress has failed to raise the debt ceiling.

[2] For the purposes of this inquiry, there are two relevant provisions of the Antideficiency Act. The first provides that "[a]n officer or employee of the United States Government or the District of Columbia government may not . . . involve either government in a contract or obligation for the payment of money before an appropriation is made unless authorized by law." 31 U.S.C. § 1341(a)(1)(B). The second provides that "[a]n officer or employee of the United States Government . . . may not accept voluntary services . . . or employ personal services exceeding that authorized by law except for emergencies involving the safety of human life or the protection of property." 31 U.S.C. § 1342.

the protection of property' does not include ongoing, regular functions of government the suspension of which would not imminently threaten the safety of human life or the protection of property." 31 U.S.C. § 1342.

With respect to the effects of this amendment, we continue to adhere to the view expressed to General Counsel Robert Damus of the Office of Management and Budget that "the 1990 amendment to 31 U.S.C. § 1342 does not detract from the Attorney General's earlier analyses; if anything, the amendment clarified that the Antideficiency Act's exception for emergencies is narrow and must be applied only when a threat to life or property is imminent." Letter for Robert G. Damus, General Counsel, Office of Management and Budget, from Walter Dellinger, Assistant Attorney General, Office of Legal Counsel (Oct. 19, 1993) ("1993 Letter"). In order to ensure that the clarification of the 1990 amendment is not overlooked, we believe that one aspect of the 1981 Opinion's description of emergency governmental functions should be modified. Otherwise, the 1981 Opinion continues to be a sound analysis of the legal authorities respecting government operations when Congress has failed to enact regular appropriations bills or a continuing resolution to cover a hiatus between regular appropriations.

## I.

Since the issuance of the extensive 1981 Opinion, the prospect of a general appropriations lapse has arisen frequently. In 1981, 1982, 1983, 1984, 1986, 1987, and 1990, lapses of funding ranging from several hours to three days actually did occur. While several of these occurred entirely over weekends, others required the implementation of plans to bring government operations into compliance with the requirements of the Antideficiency Act. These prior responses to the threat of or actual lapsed appropriations have been so commonly referred to as cases of "shutting down the government" that this has become a nearly universal shorthand to describe the effect of a lapse in appropriations. It will assist in understanding the true extent of the Act's requirements to realize that this is an entirely inaccurate description. Were the federal government actually to shut down, air traffic controllers would not staff FAA air control facilities, with the consequence that the nation's airports would be closed and commercial air travel and transport would be brought to a standstill. Were the federal government to shut down, the FBI, DEA, ATF and Customs Service would stop interdicting and investigating criminal activities of great varieties, including drug smuggling, fraud, machine gun and explosives sales, and kidnapping. The country's borders would not be patrolled by the border patrol, with an extraordinary increase in illegal immigration as a predictable result. In the absence of government supervision, the stock markets, commodities and futures exchanges would be unable to operate. Meat and poultry would go uninspected by federal meat inspectors, and therefore could not be marketed. Were the federal government to shut down, medicare payments for vital operations and medical services would cease. VA hospitals would

abandon patients and close their doors. These are simply a few of the significant impacts of a federal government shut down. Cumulatively, these actions and the others required as part of a true shutdown of the federal government would impose significant health and safety risks on millions of Americans, some of which would undoubtedly result in the loss of human life, and they would immediately result in massive dislocations of and losses to the private economy, as well as disruptions of many aspects of society and of private activity generally, producing incalculable amounts of suffering and loss.

The Antideficiency Act imposes substantial restrictions on obligating funds or contracting for services in advance of appropriations or beyond appropriated levels, restrictions that will cause significant hardship should any lapse in appropriations extend much beyond those we have historically experienced. To be sure, even the short lapses that have occurred have caused serious dislocations in the provision of services, generated wasteful expenditures as agencies have closed down certain operations and then restarted them, and disrupted federal activities. Nevertheless, for any short-term lapse in appropriations, at least, the federal government will not be truly "shut down" to the degree just described, simply because Congress has itself provided that some activities of government should continue even when annual appropriations have not yet been enacted to fund current activities.

The most significant provisions of the Antideficiency Act codify three basic restrictions on the operation of government activities. First, the Act implements the constitutional requirement that "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. Second, when no current appropriations measure has been passed to fund contracts or obligations, it restricts entering into contracts or incurring obligations (except as to situations authorized by other law). Third, it restricts employing the services of employees to perform government functions beyond authorized levels to emergency situations, where the failure to perform those functions would result in an imminent threat to the safety of human life or the protection of property.[3] The 1981 Opinion elaborated on the various exceptions in the Antideficiency Act that permit some continuing government functions, and we will only summarize the major categories here:

***Multi-year appropriations and indefinite appropriations.*** Not all government functions are funded with annual appropriations. Some operate under multi-year appropriations and others operate under indefinite appropriations provisions that do not require passage of annual appropriations legislation. Social security is a prominent example of a program that operates under an indefinite appropriation.

---

[3] These restrictions are enforced by criminal penalties. An officer or employee of the United States who knowingly and willfully violates the restrictions shall be fined not more than $5,000, imprisoned for not more than two years, or both. 31 U.S.C. § 1350 (1994).

In such cases, benefit checks continue to be honored by the Treasury, because there is no lapse in the relevant appropriation.

*Express authorizations: contracting authority and borrowing authority.* Congress provides express authority for agencies to enter into contracts or to borrow funds to accomplish some of their functions. An example is the "food and forage" authority given to the Department of Defense, which authorizes contracting for necessary clothing, subsistence, forage, supplies, etc., without an appropriation. 41 U.S.C. § 11 (1994). In such cases, obligating funds or contracting can continue, because the Antideficiency Act does not bar such activities when they are authorized by law. As the 1981 Opinion emphasized, the simple authorization or even direction to perform a certain action that standardly can be found in agencies' enabling or organic legislation is insufficient to support a finding of express authorization or necessary implication (the exception addressed next in the text), standing alone. 5 Op. O.L.C. at 4. There must be some additional indication of an evident intention to have the activity continue despite an appropriations lapse.

*Necessary implications: authority to obligate that is necessarily implied by statute.* The 1981 Opinion concluded that the Antideficiency Act contemplates that a limited number of government functions funded through annual appropriations must otherwise continue despite a lapse in their appropriations because the lawful continuation of other activities necessarily implies that these functions will continue as well. 5 Op. O.L.C. at 5. Examples include the check writing and distributing functions necessary to disburse the social security benefits that operate under indefinite appropriations. Further examples include contracting for the materials essential to the performance of the emergency services that continue under that separate exception. In addition, in the 1980 Opinion, Attorney General Civiletti opined that agencies are by necessary implication authorized "to incur those minimal obligations necessary to closing [the] agency." 4A Op. O.L.C. at 20. The 1981 Opinion reiterated this conclusion, 5 Op. O.L.C. at 10 n.12, and consistent practice since that time has provided for the orderly termination of those functions that may not continue during a period of lapsed appropriations.

*Obligations necessary to the discharge of the President's constitutional duties and powers.* Efforts should be made to interpret a general statute such as the Antideficiency Act to avoid the significant constitutional questions that would arise were the Act read to critically impair the exercise of constitutional functions assigned to the Executive. In this regard, the 1981 Opinion noted that when dealing with functions instrumental in the discharge of the President's constitutional powers, the "President's obligational authority . . . will be further buttressed in connection with any initiative that is consistent with statutes—and thus with the exercise of legislative power in an area of concurrent authority—that are more narrowly drawn than the Antideficiency Act and that would otherwise authorize

the President to carry out his constitutionally assigned tasks in the manner he contemplates." 5 Op. O.L.C. at 6–7.[4]

*Personal or voluntary services "for emergencies involving the safety of human life or the protection of property."* The Antideficiency Act prohibits contracting or obligating in advance of appropriations generally, except for circumstances just summarized above. The Act also contains a separate exception applicable to personal or voluntary services that deal with emergencies. 31 U.S.C. § 1342. This section was amended in 1990. We will analyze the effects of that amendment in Part II of this memorandum.

Finally, one issue not explicitly addressed by the 1981 Opinion seems to us to have been settled by consistent administrative practice. That issue concerns whether the emergency status of government functions should be determined on the assumption that the private economy will continue operating during a lapse in appropriations, or whether the proper assumption is that the private economy will be interrupted. As an example of the difference this might make, consider that air traffic controllers perform emergency functions if aircraft continue to take off and land, but would not do so if aircraft were grounded. The correct assumption in the context of an anticipated long period of lapsed appropriations, where it might be possible to phase in some alternatives to the government activity in question, and thus over time to suspend the government function without thereby imminently threatening human life or property, is not entirely clear. However, with respect to any short lapse in appropriations, the practice of past administrations has been to assume the continued operation of the private economy, and so air traffic controllers, meat inspectors, and other similarly situated personnel have been considered to be within the emergency exception of section 1342.

## II.

The text of 31 U.S.C. § 1342, as amended in 1990, now reads:

> An officer or employee of the United States Government or of the District of Columbia government may not accept voluntary services

---

[4] The attorneys general and this office have declined to catalog what actions might be undertaken under this heading. In 1981, for example, Attorney General Civiletti quoted Attorney General (later Justice) Frank Murphy. "These constitutional powers have never been specifically defined, and in fact cannot be, since their extent and limitations are largely dependent upon conditions and circumstances. . . . The right to take specific action might not exist under one state of facts, while under another it might be the absolute duty of the Executive to take such action." 1981 Opinion, 5 Op. O.L.C. at 7 n.9 (quoting *Request of the Senate for an Opinion as to the Powers of the President "in Emergency or State of War,"* 39 Op. Att'y Gen. 343, 347–48 (1939)). This power should be called upon cautiously, as the courts have received such Executive Branch assertions skeptically. *See, e.g.*, *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952); *George v. Ishimaru*, 849 F. Supp. 68 (D.D.C.), *vacated as moot*, No. 94-5111, 1994 WL 517746 (D.C. Cir. Aug. 25, 1994) (per curiam). *But see Haig v. Agee*, 453 U.S. 280 (1981); *In re Neagle*, 135 U.S. 1 (1890).

for either government or employ personal services exceeding that authorized by law except for emergencies involving the safety of human life or the protection of property. This section does not apply to a corporation getting amounts to make loans (except paid in capital amounts) without legal liability of the United States Government. As used in this section, the term "emergencies involving the safety of human life or the protection of property" does not include ongoing, regular functions of government the suspension of which would not imminently threaten the safety of human life or the protection of property.

31 U.S.C. § 1342 (1994). Because of the section 1342 bar on employing personal services, officers and employees may employ personal services in excess of other authorizations by law only in emergency situations.[5] This section does not by itself authorize paying employees in emergency situations, but it does authorize entering into obligations to pay for such labor.

The central interpretive task under section 1342 is and has always been to construe the scope of the emergencies exception of that section. When the 1981 Opinion undertook this task, the predecessor to section 1342 did not contain the final sentence of the current statute, which was added in 1990. Examining that earlier version, the Attorney General concluded that the general language of the provision and the sparse legislative history of it did not reveal its precise meaning. However, the opinion was able to glean some additional understanding of the statute from that legislative history.

The Attorney General noted that as originally enacted in 1884, the provision forbade unauthorized employment "except in cases of sudden emergency involving the loss of human life or the destruction of property." 1981 Opinion, 5 Op. O.L.C. at 8 (quoting Act of May 1, 1994, ch. 37, 23 Stat. 15, 17) (emphasis deleted). He then observed that in 1950, Congress enacted the modern version of the Antideficiency Act and accepted revised language for section 1342 that originally had been suggested by the Director of the Bureau of the Budget and the

---

[5] The 1981 Opinion concluded that:

[d]espite the use of the term 'voluntary service,' the evident concern underlying this provision is not government agencies' acceptance of the benefit of services rendered without compensation. Rather, the original version of [section 1342] was enacted as part of an urgent deficiency appropriation act in 1884, Act of May 1, 1994, ch. 37, 23 Stat. 15, 17, in order to avoid claims for compensation arising from the unauthorized provision of services to the government by non-employees, and claims for additional compensation asserted by government employees performing extra services after hours. This is, under [section 1342], government officers and employees may not involve government in contract for *employment*, *i.e.*, for compensated labor, except in emergency situations. 30 Op. Att'y Gen. 129, 131 (1913).

5 Op. O.L.C. at 8 (emphasis in original).

Comptroller General in 1947. 5 Op. O.L.C. at 9. In analyzing these different formulations, the Attorney General stated that

> [w]ithout elaboration, these officials proposed that "cases of sudden emergency" be amended to "cases of emergency," "loss of human life" to "safety of human life," and "destruction of property" to "protection of property." These changes were not qualified or explained by the report accompanying the 1947 recommendation or by any aspect of the legislative history of the general appropriations act for fiscal year 1951, which included the modern [section 1341]. Act of September 6, 1950, Pub. L. No. 81-759, § 1211, 64 Stat. 765. Consequently, we infer from the plain import of the language of their amendments that the drafters intended to broaden the authority for emergency employment.

*Id.*

The 1981 Opinion also sought guidance from the consistent administrative practice of the Office of Management and Budget ("OMB") in applying identical "emergencies" language found in another provision. That other provision prohibits OMB from apportioning appropriated funds in a manner that would indicate the need for a deficiency or supplemental appropriation, except in cases of "emergencies involving the safety of human life, [or] the protection of property"— phraseology identical to the pre-1990 version of section 1342.[6] Combining these two sources with the statutory text, the Attorney General articulated two rules for identifying functions for which government officers may enter into obligations to pay for personal services in excess of legal authority other than section 1342 itself:

---

[6] 31 U.S.C. § 1515 (recodified from section 665(e) at the time of the 1981 Opinion). Analyzing past administrative practice under this statute, Attorney General Civiletti found that:

> Directors of the Bureau of the Budget and of the Office of Management and Budget have granted dozens of deficiency reapportionments under this subsection in the last 30 years, and have apparently imposed no test more stringent than the articulation of a reasonable relationship between the funded activity and the safety of human life or the protection of property. Activities for which deficiency apportionments have been granted on this basis include [FBI] criminal investigations, legal services rendered by the Department of Agriculture in connection with state meat inspection programs and enforcement of the Wholesome Meat Act of 1967, 21 U.S.C. §§ 601–695, the protection and management of commodity inventories by the Commodity Credit Corporation, and the investigation of aircraft accidents by the National Transportation Safety Board. These few illustrations demonstrate the common sense approach that has guided the interpretation of § 665(e). Most important, under § 665(e)(2), each apportionment or reapportionment indicating the need for a deficiency or supplemental appropriation has been reported contemporaneously to both Houses of Congress, and, in the face of these reports, Congress has not acted in any way to alter the relevant 1950 wording of § 665(e)(1)(B), which is, in this respect, identical to § 665(b).

1981 Opinion, 5 Op. O.L.C. at 9–10 (footnotes omitted).

> First, there must be some reasonable and articulable connection be-
> tween the function to be performed and the safety of human life or
> the protection of property. Second, there must be some reasonable
> likelihood that the safety of human life or the protection of property
> would be compromised, in some degree, by delay in the performance
> of the function in question.

5 Op. O.L.C. at 8.

While we continue to believe that the 1981 articulation is a fair reading of the Antideficiency Act even after the 1990 amendment, *see* 1993 Letter, we are aware of the possibility the second of these two rules might be read more expansively than was intended, and thus might be applied to functions that are not emergencies within the meaning of the statute. To forestall possible misinterpretations, the second criteria's use of the phrase "in some degree" should be replaced with the phrase, "in some significant degree."

The reasons for this change rest on our understanding of the function of the 1990 amendment, which comes from considering the content of the amendment, its structure, and its sparse legislative history. That history consists of a solitary reference in the conference report to the Omnibus Budget Reconciliation Act of 1990, Pub. L. No. 101-508, 104 Stat. 1388:

> The conference report also makes conforming changes to title 31 of
> the United States Code to make clear that . . . ongoing, regular opera-
> tions of the Government cannot be sustained in the absence of ap-
> propriations, except in limited circumstances. These changes guard
> against what the conferees believe might be an overly broad interpre-
> tation of an opinion of the Attorney General issued on January 16,
> 1981, regarding the authority for the continuance of Government
> functions during the temporary lapse of appropriations, and affirm
> that the constitutional power of the purse resides with Congress.

H.R. Rep. No. 101-964, at 1170 (1990). While hardly articulating the intended scope of the exception, the conference report does tend to support what would otherwise be the most natural reading of the amendment standing alone: because it is phrased as identifying the functions that should be excluded from the scope of the term "emergency," it seems intended to limit the coverage of that term, narrowing the circumstances that might otherwise be taken to constitute an emergency within the meaning of the statute.

Beyond this, however, we do not believe that the amendment adds any signifi-cant new substantive meaning to the pre-existing portion of section 1342, simply because the most prominent feature of the addition—its emphasis on there being a threat that is imminent, or "ready to take place, near at hand," *see Webster's Third New International Dictionary* 1130 (1986)—is an idea that is already present in

the term "emergency" itself, which means "an unforeseen combination of circumstances or the resulting state that calls for immediate action" to respond to the occurrence or situation. *Id.* at 741.[7] The addition of the concept of "imminent" to the pre-existing concept of "emergency" is thus largely redundant. This redundancy does, however, serve to emphasize and reinforce the requirement that there be a threat to human life or property of such a nature that immediate action is a necessary response to the situation. The structure of the amendment offers further support for this approach. Congress did not alter the operative language of the statute; instead, Congress chose to enact an interpretive provision that simply prohibits overly expansive interpretations of the "emergency" exception.

Under the formulation of the 1981 Opinion, government functions satisfy section 1342 if, *inter alia*, the safety of human life or the protection of property would be "compromised, in some degree." 5 Op. O.L.C. at 8. It is conceivable that some would interpret this phrase to be satisfied even if the threat were de minimis, in the sense that the increased risk to life or property were insignificant, so long as it were possible to say that safety of life or protection of property bore a reasonable likelihood of being compromised at all. This would be too expansive an application of the emergency provision. The brief delay of routine maintenance on government vehicles ought not to constitute an "emergency," for example, and yet it is quite possible to conclude that the failure to maintain vehicles properly may "compromise, to some degree" the safety of the human life of the occupants or the protection of the vehicles, which are government property. We believe that the revised articulation clarifies that the emergencies exception applies only to cases of threat to human life or property where the threat can be reasonably said to the near at hand and demanding of immediate response.

WALTER DELLINGER
*Assistant Attorney General*
*Office of Legal Counsel*

---

[7] *See also Random House Dictionary of the English Language Unabridged* 636 (2d ed. 1987) ("emergency" means "a sudden, urgent, usually unexpected occurrence or occasion requiring immediate action"); *Webster's II New Riverside University Dictionary* 427 (1988) ("an unexpected, serious occurrence or situation urgently requiring prompt action").